2012 ME 70

**Robert GOUDREAU et al.**

v.

**PINE SPRINGS ROAD AND WATER, LLC.**

Supreme Judicial Court of Maine.

Argued: April 11, 2012.
Decided: May 29, 2012.

Thomas G. Van Houten, Esq., Springvale, for appellants Robert Goudreau, Catherine Goudreau, Wilfred Taylor, Marylu Taylor, Jean Campbell, and Robert Campbell.

John P. McVeigh, Preti Flaherty, LLP, Portland, for appellee Pine Springs Road and Water, LLC.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1] Robert Goudreau, Catherine Goudreau, Wilfred Taylor, Marylu Taylor, Jean Campbell, and Robert Campbell ("the Lot Owners") appeal from the judgment entered in the Superior Court (York County, *Fritzsche, J.*) finding that they were not entitled to form a road association pursuant to 23 M.R.S. § 3101 (2011) and are bound by certain restrictive covenants to pay an annual maintenance fee to Pine Springs Road and Water, LLC (PSRW) for subdivision road maintenance. On appeal, the Lot Owners argue that the court erred in concluding that they did not meet the criteria for establishing a statutory road association pursuant to section 3101 and that the covenants requiring the payment of an annual maintenance fee are not binding on them. We agree with the Lot Owners and vacate the judgment.

## I. BACKGROUND

[¶ 2] The following facts are derived from the parties' stipulation of facts and accompanying exhibits. In 1967 and 1968, Albert Cameron conveyed certain real estate in Shapleigh to Pine Springs Development Corporation (Pine Springs), a closely held corporation of which Cameron was a principal. Later, the property was subdivided in several phases and the subdivision plans were recorded in the York County Registry of Deeds.

[¶ 3] The Lot Owners each purchased real estate from Pine Springs or from predecessors in title who had purchased real estate from Pine Springs by deeds that referenced numbered lots on the recorded subdivision plans; the subdivision includes a network of interconnected roads and bridges that benefit the Lot Owners' properties. Specifically, the Taylors acquired title to their respective lots by conveyances from Pine Springs in 1980 that included an express grant of "a right-of-way to and from the lot herein conveyed to the Newfield–Ross Corner Highway over and across other land of the Grantor Corporation." The Goudreaus acquired title to their lot by a conveyance in 1997 that expressly included "the right to travel over all the roads as shown on said [subdivision] plan for the purpose of access to and from the public highway." The Campbells acquired title to their lot in 1999 by a conveyance that expressly included "a right-of-way to and from the lot herein conveyed to the Newfield Ross Corner Highway over and across other land of [Pine Springs]."

[¶ 4] The Town of Shapleigh never accepted the roads in the subdivision and the roads remain privately owned. PSRW claims ownership of the roads, and the Lot Owners, although not conceding PSRW's ownership of the roads, consented that the trial court "decide [the] matter as though all [the] [p]laintiffs initially took their lots without a conveyance of a fee interest in the abutting roads."

[¶ 5] In 1968, Pine Springs recorded a document entitled "Extract of Minutes of Meeting of the Directors of Pine Springs Development Corp." that purported to establish a number of restrictive covenants regarding the subdivision lots at issue

here. In particular, the document provided, pursuant to paragraph 14(A)(3), that each lot purchaser agreed to pay to Pine Springs or its successors an annual $100 fee "for the right to enjoy such of the following privileges, facilities, improvements, services, and benefits," which included, "[p]urchase, construction, improvement, and maintenance of roads, beach and other recreational facilities, including the snowplowing of said roads and ways." Additionally, paragraph 14(E) provided that the $100 charge "shall run with and bind the land ... until December 31, 1980, unless earlier terminated by written release of the grantor." Each deed the Lot Owners received provided that it was made subject to the conditions and restrictions contained in the 1968 document.

[¶ 6] On October 10, 1975, a corporation named the Pine Springs Lake Association was formed. A number of years later, on April 5, 1988, a document entitled "Minutes of Meeting of Directors of Pine Springs Lake Association Corp." was recorded. The document purported to transfer Pine Springs's road maintenance responsibilities pursuant to the 1968 minutes to the Lake Association and provided that "[t]he maintenance fee is due Pine Springs Lake Association" and that "this fee shall run with and bind any land conveyed by any successive owner of [Pine Springs] and shall be binding upon the grantee or grantees, his, her, their or its heirs, executors, administrators, successors and assigns unless terminated by written release of Pine Springs Lake Association." However, on October 14, 1997, the Lake Association was dissolved and "all road maintenance functions" were returned to Pine Springs.

[¶ 7] On December 18, 1997, Pine Springs recorded a document entitled "Extension and Amendment of Extract of Minutes [of] Meeting of Directors of Pine Springs Development Corp." The document purported to extend the restrictions, conditions, and rights contained in the 1968 minutes. It also increased the annual road maintenance fee to $150 and provided that the "charge shall run with and bind the land herein conveyed ... in perpetuity unless terminated by written, recorded release of said grantor Corporation."

[¶ 8] Several years later, on December 13, 2005, Pine Springs, through deeded conveyances, transferred all of its remaining rights and interests in the subdivision properties to PSRW.

[¶ 9] The Lot Owners filed an amended complaint in the Superior Court on February 22, 2011, seeking a declaratory judgment as to whether, among other things, they were empowered to form a road association pursuant to 23 M.R.S. §§ 3101–3104 (2011) and whether the covenants regarding the road maintenance fees were valid, and if so, to what extent. The court found that the Lot Owners could not form a road association because their lots were not benefited by easements and the subdivision roads did not fall within the statute's definition of "private ways." Regarding the extension of the road maintenance fees, the court interpreted the December 31, 1980, expiration date in the 1968 minutes as meaning that only the $100 fee rate itself would potentially expire on that date, not Pine Springs's right to maintain the roads and bill for that service. The Lot Owners then instituted this appeal.

## II. DISCUSSION

### A. Statutory Road Association

[¶ 10] The Lot Owners argue that the court erred in finding that their lots are not benefited by easements and in concluding that section 3101 is inapplicable to the subdivision roads at issue.

[¶ 11] "We review a trial court's factual findings for clear error and its application of the law to those facts de novo." *Peters v. O'Leary*, 2011 ME 106, ¶ 15, 30 A.3d 825. The parties have stipulated to the facts, and the interpretation of a deed is a matter of law reviewed de novo. *Matteson v. Batchelder*, 2011 ME 134, ¶ 12, 32 A.3d 1059. Likewise, we "review legal questions of statutory interpretation de novo." *Peters*, 2011 ME 106, ¶ 13, 30 A.3d 825.

[¶ 12] The process for forming a statutory road association may be set in motion when certain conditions are met:

> When 4 or more parcels of land are benefited by a private road, private way or bridge as an easement or by fee ownership of the private road, private way or bridge, the owners of any 3 or more of the parcels, as long as at least 3 of the parcels are owned by different persons, may make written application to a notary public to call a meeting.

23 M.R.S. § 3101(2). For purposes of section 3101, a "private way" means "an easement held by a municipality for purposes of public access to land or water not otherwise connected to a public way." *Id.* §§ 3101(1)(A), 3021(2) (2011). The court correctly concluded that the subdivision roads do not meet this definition because the parties stipulated that the Town of Shapleigh has not accepted the roads and the roads remain privately owned.

[¶ 13] However, the court did not consider whether the subdivision roads fall within the plain language meaning of the term "private road" as distinct from "private way" and used in section 3101. For purposes of section 3101, and absent a relevant statutory definition to the con-

trary, we interpret the phrase "private road" to mean precisely what it says in plain and ordinary language: a road that is privately owned. *See Peters*, 2011 ME 106, ¶ 13, 30 A.3d 825 (explaining that unambiguous statutory language is interpreted according to its plain meaning). Here, the subdivision roads are privately owned; we therefore conclude that they fall within the plain and ordinary meaning of "private road" as that phrase is used in section 3101.

[¶ 14] We further conclude that the stipulated facts compel the finding that the Lot Owners' parcels are benefited by easements over the private roads. The language of each deed clearly and unequivocally conveys an express right-of-way over the subdivision roads for purposes of access to and from each parcel to the public highway.[1] Each of the Lot Owners, therefore, has the right to make use of the subdivision's private roads. That "right" is an easement. *See Matteson*, 2011 ME 134, ¶ 16, 32 A.3d 1059 ("A right-of-way is a form of easement.").

[¶ 15] As a result, the Lot Owners may seek to establish a road association pursuant to section 3101. Combined, they own four parcels of land, three of which are owned by different persons, and those parcels are benefited by easements over the subdivision's private roads.

B. Covenants to Pay Road Maintenance Fee

[¶ 16] The Lot Owners argue that they are not obligated to pay PSRW an annual road maintenance fee because the purported covenant providing for such a fee expired in December 1980 and any

---

1. We also note that the purchaser of a subdivision lot by reference to a recorded subdivision plan receives a right-of-way over the ways laid out in the recorded subdivision plan by operation of law. *See* 23 M.R.S. § 3031(2) (2011); *Murch v. Nash*, 2004 ME 139, ¶ 12, 861 A.2d 645.

subsequent attempts by Pine Springs or PSRW to extend or revive it were invalid.

[¶ 17] The construction of a deed and the interpretation of a covenant are questions of law we review de novo. *See Silsby v. Belch,* 2008 ME 104, ¶ 7, 952 A.2d 218. "The relevant language will be given its ordinary meaning and this meaning governs unless there is ambiguity present." *Id.*

[¶ 18] The Lot Owners' deeds are expressly made subject to the conditions and restrictions contained in the 1968 minutes. In addition, the Campbells' predecessors in title and the Goudreaus' predecessor in title also received deeds that were subject to the restrictions and conditions contained in the 1968 minutes. *See* Restatement (Third) Property: Servitudes § 5.1 cmt. a. (2000) (explaining that a covenant that creates a benefit or burden that runs with the land passes "rights or liabilities to successors to land held by the original parties").

[¶ 19] Unlike other restrictions and conditions contained in the 1968 minutes, the obligation to pay an annual maintenance fee to Pine Springs or its successors has a sunset provision: "[T]his charge shall run with and bind the land herein conveyed . . . until December 31, 1980, unless earlier terminated by written release of the grantor, its successors and assigns." Construing this provision according to its plain and unambiguous language, we conclude that the obligation to pay an annual maintenance fee to Pine Springs expired on December 31, 1980. Nothing in the plain language of the deeds or the 1968 minutes contemplates extension of the charge beyond that date. Tellingly, the language of the sunset provision provides for termination by written release prior to December 31, 1980, but is silent as to its amendment or extension beyond that date.

[¶ 20] Further, nothing in the express language of the 1968 minutes or the Lot Owners' deeds contemplated that the obligation would be amended, renewed, or extended. Absent such language, neither Pine Springs nor its successors can unilaterally revive that obligation and impose it on the Lot Owners. *See* 9 Richard R. Powell, Powell on Real Property § 60.08 (Michael A. Wolf & James H. Backman, eds., LexisNexis 2012) ("Once the first lot is sold, the grantor's right to unilaterally amend the covenants continues only if either the grantor specifically reserves that right or if the benefit of the covenants is personal to the grantor."). As a result, the court erred by concluding that the covenant pertaining to the payment of road maintenance fees in the 1968 minutes remained in effect beyond December 31, 1980.

[¶ 21] PSRW maintains that the Lake Association minutes and the 1997 Extension and Amendment document establish that the obligation to pay some amount of money for road maintenance remained in force and is binding on the Lot Owners. We disagree.

[¶ 22] The Taylors acquired their lots in 1980 by deeded conveyances from Pine Springs that were made subject to the restrictions and conditions contained in the 1968 minutes. As we have explained, the obligation to pay an annual road maintenance fee to Pine Springs expired on December 31, 1980. Pine Springs could not unilaterally revive that obligation or unilaterally impose a new obligation on the Taylors to pay a road maintenance fee.

[¶ 23] The Goudreaus' predecessor in title, the Toveys, acquired title to their lot in the subdivision from Pine Springs on February 23, 1988. The Lake Association minutes were not recorded until April 5, 1988. Accordingly, as we explained above, Pine Springs could not unilaterally bind the Toveys to any obligation contained in

the Lake Association minutes because they were recorded after the Toveys had already acquired title to their lot in a deeded conveyance from Pine Springs, and the only conditions or restrictions the Toveys' deed referenced were those contained in the 1968 minutes.

[¶ 24] Although the Goudreaus' deed from the Toveys provided that it was subject to the 1988 Lake Association minutes, our review of the record establishes that the Goudreaus are not bound by the Lake Association minutes to pay a road maintenance fee to PSRW. The Lake Association was dissolved on October 14, 1997, more than two months before the Goudreaus acquired title to their lot from the Toveys on December 30, 1997, rendering the obligation in the 1988 Lake Association minutes to pay a maintenance fee to the Lake Association a nullity because that entity no longer existed.[2]

[¶ 25] Similarly, the Campbells were not obligated to pay an annual road maintenance fee by virtue of the deeded conveyances involving their predecessors in title. Those conveyances made express reference only to the restrictions contained in the 1968 minutes and none of those conveyances occurred between April 5, 1988, when the Lake Association minutes were recorded, and October 14, 1997, when the Lake Association dissolved.

[¶ 26] Finally, neither the Campbells nor the Goudreaus are bound by the Extension and Amendment document recorded on December 18, 1997. The express terms of that document provide that it applies only to "properties hereafter sold by Pine Springs Development Corporation." The Campbells and Goudreaus took title to their respective lots by conveyances after December 18, 1997, from sellers other than Pine Springs, and their respective deeds make no reference to the 1997 document. Accordingly, they are not bound by any of the restrictions or obligations in the 1997 Extension and Amendment document.

## III. CONCLUSION

[¶ 27] In summary, we conclude that the Lot Owners are authorized pursuant to 23 M.R.S. § 3101 to begin the process of forming a road association because their lots are benefited by easements over the subdivision's private roads. Further, they are not obligated to pay Pine Springs or its successor PSRW a road maintenance fee because the original obligation to pay a maintenance fee in the 1968 minutes expired by its own terms on December 31, 1980; nor were the Lot Owners here obligated by the Lake Association minutes or the 1997 Extension and Amendment document to pay a road maintenance fee.

The entry is:

Judgment vacated. Remanded for the entry of a judgment consistent with this opinion.

---

2. We offer no opinion as to what the parties may have intended in providing that the Goudreaus be bound by the Lake Association minutes despite the fact that the Lake Association no longer existed. The Toveys are not a party to this matter and the facts necessary for making such a determination are not before us on this record.